UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| WASHINGTON HEALTH CARE ASSOCIATION,<br><br>　　　　　　　Plaintiff,<br><br>　v.<br><br>ROBIN ARNOLD-WILLIAMS, et al,<br><br>　　　　　　　Defendant. | Case No. C08-5427RJB<br><br>ORDER ON MOTIONS FOR SUMMARY JUDGMENT |

This matter comes before the court on Plaintiff's Motion for Partial Summary Judgment on First Cause of Action (Dkt. 14) and on Defendants' Summary Judgment Motion (Dkt. 20). The court has considered the pleadings filed in support of and in opposition to the motions, the oral argument of counsel, and the file herein.

PROCEDURAL AND FACTUAL BACKGROUND

1. *Licensure and Services*. Boarding homes are licensed and regulated pursuant to the provisions of RCW 18.20 and Wash. Admin. Code 388-78A. Boarding homes are facilities that provide housing and basic services to, and assume general responsibility for the safety and well-being of, individual residents. *See* RCW 18.20.020(1). This includes providing housekeeping services, meals, nutritious snacks, laundry, and activities; coordinating and arranging for health care services; providing emergency assistance; responding appropriately when there are observable or reported

changes in the resident's physical, mental, or emotional functioning; and providing medicating assistance as permitted by law. *See* RCW 18.20.020(2) and (8). If a boarding home assumes general responsibility for the safety and well being of a resident; provides assistance with activities of daily living; provides health support services; or provides intermittent nursing services, it must obtain a license from the Washington Department of Social and Health Services (DSHS) and/or its Aging and Disability Services Administration (ADSA). *See* RCW 18.20.030.

2. *Long-Term Care Resident Rights Act.* Boarding homes are required to comply with the Long-Term Care Resident Rights Act, Chapter 70.129 RCW. *See* RCW 70.129.010. Under RCW 70.129.110(1), a facility must permit each resident to remain in the facility, and not transfer or discharge the resident from the facility unless (a) the transfer or discharge is necessary for the resident's welfare and the resident's needs cannot be met in the facility; (b) the safety of individuals in the facility is endangered; (c) the health of individuals in the facility would otherwise be endangered; (d) the resident has failed to make the required payment for his or her stay; or (e) the facility ceases to operate.

RCW 70.129.110, which was originally enacted in 1994, governs transfer of residents from long term care facilities, including boarding homes. RCW 70.129.110 provides in relevant part as follows:

> (3) Before a long-term care facility transfers or discharges a resident, the facility must:
>
> (a) First attempt through reasonable accommodations to avoid the transfer or discharge, unless agreed to by the resident;
>
> (b) Notify the resident and representative and make a reasonable effort to notify, if known, an interested family member of the transfer or discharge and the reasons for the move in writing and in a language and manner they understand;
>
> (c) Record the reasons in the resident's record; and
>
> (d) Include in the notice the items described in subsection (5) of this section.
>
> (4) (a) Except when specified in this subsection, the notice of transfer or discharge required under subsection (3) of this section must be made by the facility at least thirty days before the resident is transferred or discharged.
>
> (b) Notice may be made as soon as practicable before transfer or discharge when:
>
> (i) The safety of individuals in the facility would be endangered;
>
> (ii) The health of individuals in the facility would be endangered;

      (iii) An immediate transfer or discharge is required by the resident's urgent medical needs; or

      (iv) A resident has not resided in the facility for thirty days.

 (5) The written notice specified in subsection (3) of this section must include the following:

  (a) The reason for transfer or discharge;

  (b) The effective date of transfer or discharge;

  (c) The location to which the resident is transferred or discharged;

  (d) The name, address, and telephone number of the state long-term care ombudsman;

  (e) For residents with developmental disabilities, the mailing address and telephone number of the agency responsible for the protection and advocacy of developmentally disabled individuals established under part C of the developmental disabilities assistance and bill of rights act; and

  (f) For residents who are mentally ill, the mailing address and telephone number of the agency responsible for the protection and advocacy of mentally ill individuals established under the protection and advocacy for mentally ill individuals act.

 (6) A facility must provide sufficient preparation and orientation to residents to ensure safe and orderly transfer or discharge from the facility.

 (7) A resident discharged in violation of this section has the right to be readmitted immediately upon the first availability of a gender-appropriate bed in the facility.

  3. *Medicaid Provider Agreements.* In addition to the general services provided by licensed boarding homes pursuant to chapter 18.20 RCW, boarding homes may also contract with the State to provide assisted living services and adult residential care to certain residents pursuant to RCW 74.39A and WAC 388-110. *See* RCW 74.39A.010; RCW 74.39A.020. The contracts between boarding homes and the State are known as provider agreements. Pursuant to provider agreements, boarding homes may provide services and care to individuals eligible for Medicaid benefits. Medicaid is a cooperative federal and state program through which the federal government provides financial assistance to participating states to assist in the care of financially needy and disabled persons. *See* 42 U.S.C. § 1396 *et seq.*

  The provider agreements vary because they fall into several classifications depending upon the particular services offered by the boarding home. However, each provider agreement contains (1) an end date (Dkt. 16-2, at 2); (2) a provision that the contract shall automatically terminate on the

effective date of a change in license (Dkt. 16-2, at 15); and a provision for termination for convenience, which provides as follows:

> **Termination for Convenience**. DSHS may terminate this Contract in whole or in part when it is in the best interest of DSHS by giving the Contractor at least thirty (30) calendar days' written notice. The Contractor may terminate this Contract for convenience by giving DSHS at least thirty (30) calendar days' written notice addressed to DSHS at the address listed on page 1 of this Contract.

Dkt. 16-2, at 9. *Emphasis in the original.*

The provider agreement also contains provisions regarding the boarding home's and the State's obligations upon termination or expiration of the provider agreement, including the following: (1) a Termination or Expiration Procedure provides that the boarding home shall cease to perform any services required by the contract as of the effective date of termination or expiration and that DSHS shall be liable only for payment required under the terms of the contract for service rendered up to the effective date of termination or expiration (Dkt. 16-2, at 9); and (2) a Payment for Services provision states that if the contract is terminated for any reason, DSHS shall pay for only those services authorized and provided though the date of termination (Dkt. 16-2, at 15).

4. *Actions Leading up to Enactment of RCW 18.20.440.* Boarding homes contend that the Medicaid reimbursement rate is almost always below the actual costs of providing boarding home services, and that the disparity between the reimbursement rate and actual boarding home costs has grown. Dkt. 16, at 4-5 (declaration of Lee Field, founder and CEO of Senior Services of America, LLC, a boarding home). DSHS contends that the study relied upon by plaintiff provides limited insight into the actual costs of providing care and services in licensed boarding homes in comparison to DSHS's Medicaid payment rates, and that plaintiff has not submitted competent evidence concerning this issue. Dkt. 20, at 26. It appears that, for some time, DSHS's rate of payment for Medicaid residents in boarding homes has been a source of conflict between DSHS and boarding homes.

In November of 2007, Robin Arnold-Williams informed the governor by memo that Assisted Living Concepts (ALC), a company that operates boarding homes in Washington (but is not a named party in this case), notified DSHS that it was terminating the provider agreements for two of the twenty-one boarding homes the company operated in Washington, and that it planned to withdraw the

rest from the Medicaid program in the future. Dkt. 15-4, at 7. Ms. Arnold-Williams stated that "[t]his will require all residents receiving state assistance to relocate before the end of January 2008." Dkt. 15-4, at 7.

5. *SB 6807 (RCW 18.20.440).* On March 28, 2008, SB 6807 was signed into law and the law came into effect the same day because the bill contained an emergency clause. *See* Laws of 2008, ch. 251, § 3. Section 1 of SB 6807 added new provisions to chapter 18.20 RCW. Section 1 (RCW 18.20.440) provides as follows:

**Withdrawal from medicaid program--Notice--Duties**

(1) *If a boarding home voluntarily withdraws from participation in a state medicaid program for residential care and services under chapter 74.39A RCW, but continues to provide services of the type provided by boarding homes, the facility's voluntary withdrawal from participation is not an acceptable basis for the transfer or discharge of residents of the facility (a) who were receiving medicaid on the day before the effective date of the withdrawal; or (b) who have been paying the facility privately for at least two years and who become eligible for medicaid within one hundred eighty days of the date of withdrawal.*

(2) A boarding home that has withdrawn from the state medicaid program for residential care and services under chapter 74.39A RCW must provide the following oral and written notices to prospective residents. The written notice must be prominent and must be written on a page that is separate from the other admission documents. The notice shall provide that:

(a) The facility will not participate in the medicaid program with respect to that resident; and

(b) The facility may transfer or discharge the resident from the facility for nonpayment, even if the resident becomes eligible for medicaid.

*(3) Notwithstanding any other provision of this section, the medicaid contract under chapter 74.39A RCW that exists on the day the facility withdraws from medicaid participation is deemed to continue in effect as to the persons described in subsection (1) of this section for the purposes of:*

*(a) Department payments for the residential care and services provided to such persons;*

*(b) Maintaining compliance with all requirements of the medicaid contract between the department and the facility; and*

*(c) Ongoing inspection, contracting, and enforcement authority under the medicaid contract, regulations, and law.*

(4) Except as provided in subsection (1) of this section, this section shall not apply to a person who begins residence in a facility on or after the effective date of the facility's withdrawal from participation in the medicaid program for residential care and services.

(5) A boarding home that is providing residential care and services under chapter 74.39A RCW shall give the department and its residents sixty days' advance notice of the facility's intent to withdraw from participation in the medicaid program.

> *(6) Prior to admission to the facility, a boarding home participating in the state medicaid program for residential care and services under chapter 74.39A RCW must provide the following oral and written notices to prospective residents. The written notice must be prominent and must be written on a page that is separate from the other admission documents, and must provide that:*
>
> > *(a) In the future, the facility may choose to withdraw from participating in the medicaid program;*
> >
> > *(b) If the facility withdraws from the medicaid program, it will continue to provide services to residents (i) who were receiving medicaid on the day before the effective date of the withdrawal; or (ii) who have been paying the facility privately for at least two years and who will become eligible for medicaid within one hundred eighty days of the date of withdrawal;*
> >
> > (c) After a facility withdraws from the medicaid program, it may transfer or discharge residents who do not meet the criteria described in this section for nonpayment, even if the resident becomes eligible for medicaid.

RCW 18.20.440. *Italics added.* At issue in this case are the provisions of RCW 18.20.440 that apply to boarding home residents who were receiving medicaid on the day before the effective date of the withdrawal [from Medicaid]; or who have been paying the facility privately for at least two years and who become eligible for medicaid within one hundred eighty days of the date of withdrawal [from Medicaid]. This case does not challenge other provisions of RCW 18.20.440 as they apply to boarding home residents who enter the facility after a boarding home withdraws from the Medicaid program.

On March 28, 2008, the day that RCW 18.20.440 took effect, twenty-one assisted living or boarding home providers notified DSHS that they were voluntarily withdrawing from participation in the Medicaid program." Dkt. 15-3, at 2. Nineteen of these providers were owned by ALC. Dkt. 15-3, at 2.

6. *Federal Court Case.* On July 8, 2008, plaintiff Washington Health Care Association (WHCA), an association acting on behalf of boarding home members, filed this case for declaratory and injunctive relief against Robin Arnold-Williams, Secretary of the Washington Department of Social and Health Services, and Kathy Leitch, Assistant Secretary of the Aging and Disability Services Administration of the Washington Department of Social and Health Services. Dkt. 1. Defendants are hereafter referred to as DSHS. The complaint requests that the court enter an order under 42 U.S.C. § 1983 and 28 U.S.C. § 2201(a), declaring that Washington Substitute Senate Bill 6807 (SB 6807), codified at RCW 18.20.440, violates the Contract Clause of the Constitution (U.S. const. art. 1, § 10);

violates the Due Process Clause of the Fourteenth Amendment; and violates the Takings Clause of the Fifth Amendment. Dkt. 1. The complaint does not plead a claim under the Washington Constitution, art. 1, § 23, which provides as follows: "No bill of attainder, ex post facto law, or law impairing the obligations of contracts shall ever be passed." However, the court notes that the federal and state contract clauses are given the same effect. *Margola Assocs. v. City of Seattle,* 121 Wash.2d 625, 653, 854 P.2d 23 (1993).

On December 9, 2008, the court entered an order, pursuant to the stipulation of the parties, dismissing without prejudice plaintiff's claims under the Due Process Clause of the Fourteenth Amendment and under the Takings Clause of the Fifth Amendment. Dkt. 40. Accordingly, the only claim at issue in this case, and in these motions for summary judgment, is a claim under the Contract Clause of the U.S. Constitution. Although originally filed by WHCA as a motion for partial summary judgment (Dkt. 14), the dismissal of the Fourteenth Amendment and Takings claims makes WHCA's motion for partial summary judgment a motion for summary judgment resolving the entire case in WHCA's favor.

## MOTION FOR SUMMARY JUDGMENT

On October 16, 2008, WHCA filed a motion for partial summary judgment, requesting that the court declare that RCW 18.20.440 violates the Contract Clause of the U.S. Constitution, U.S. const. art. 1, § 10. Dkt. 14. WHCA argues that RCW 18.20.440 substantially impairs various essential terms of the standard boarding home provider agreement and destroys boarding homes' basic contractual expectations by eliminating the agreements' expiration and termination provisions; that the State has no reserved right to impair provider agreements through subsequent legislation; that the State cannot carry its burden of demonstrating that RCW 18.20.440 is reasonable and necessary; that RCW 18.20.440 is not reasonable because the public interest at issue existed when the agreements were executed, the law is not proportionate or tailored to serve the public interest at issue, and the law is not necessary. *Id.* WHCA maintains that RCW 18.20.440 violates the Contract Clause of the U.S. Constitution because it requires a boarding home with 20 Medicaid residents on the day it terminates its provider agreement to continue to provide services to those residents for as long as they are willing and able to remain in the home, at the Medicaid reimbursement rate that is set by the State.

On November 24, 2008, defendants filed a motion for summary judgment and a response to plaintiff's motion for summary judgment. Dkt. 20. Defendants argue that (1) RCW 18.20.440 does not violate the Contract Clause of the U.S. Constitution because the statute balances important protections for vulnerable Medicaid residents against the business interests of boarding homes participating in Medicaid; (2) legislation extending protections to vulnerable populations or the impoverished, or attempting to prevent impoverishment is afforded a high degree of deference; (3) in *Linton by Arnold v. Comm'r of Health & Environment*, 65 F.3d 508 (6th Cir. 1995), *cert. denied*, 517 U.S. 1155 (1996), the Sixth Circuit upheld, as constitutional, impairment of a Medicaid contract by requiring retention of Medicaid residents following nursing homes' withdrawal from Medicaid; (4) plaintiff has not shown competent evidence to support its claim that DSHS' rates do not adequately cover boarding home costs; (5) RCW 18.20.440 serves a vitally important public purposes by mitigating forced discharges of Medicaid residents caused by a boarding home's withdrawal from the program; (6) the conditions imposed by RCW 18.20.440 are reasonable; (7) Medicaid provider attrition was not foreseeable; (8) paying boarding homes the private pay rate to keep residents at the boarding homes is not reasonable nor is it legal under the federal Medicaid program; (9) RCW 18.20.440 will not induce Medicaid roll-overs (conversion from private pay to Medicaid) because federal and state laws strictly limit such a practice; (10) plaintiff's Takings claim is not ripe and should be dismissed; (11) plaintiff's Due Process claim should be dismissed because it is duplicative of the Contract Clause claim and fails to establish conduct by defendants that shocks the conscience. Dkt. 20.

On December 18, 2008, DSHS filed a reply in support of its motion for summary judgment, stating that the parties agree that RCW 18.20.440 modifies the termination provision of DSHS' existing Medicaid contract with boarding homes; that the modification is most likely substantial for purposes of a Contract Clause analysis, because it affects a contract term that the boarding homes maintain is important to them; and that, because the law affects the State's own contracts, it is subject to higher scrutiny than statutes that modify private contracts. Dkt. 42, at 2. DSHS maintains that the law is reasonable and necessary to achieve a critical purpose, which is to mitigate the very real consequences that forced discharges from boarding homes can impose on the health and well-being of

low income, vulnerable, elderly and disabled clients. *Id.* DSHS contends that RCW 18.20.440 does not reduce, limit or negate the State's obligation to pay for Medicaid clients, nor does it reduce boarding home rates; that the extent of the contract impairment is limited because the statute requires a boarding home withdrawing from Medicaid to retain only limited numbers of Medicaid residents for a limited duration; that the State enacted the law as soon as the problem developed in Washington; and that the alternatives suggested by WHCA are not reasonable. Dkt. 42.

## STANDING

As an initial matter, the court must determine whether it has jurisdiction over this case. Under Article III of the U.S. Constitution, a federal court cannot consider the merits of a legal claim unless the person seeking to invoke the jurisdiction of the court establishes the requisite standing to sue. *Whitmore v. Arkansas*, 495 U.S. 149 (1990). To establish the constitutional aspect of standing, the court must determine whether the plaintiff has made out a case or controversy between plaintiff and the defendant within the meaning of Article III by demonstrating a sufficient personal stake in the outcome. *Warth v. Seldin*, 422 U.S. at 498.

A litigant demonstrates standing by showing that he or she has suffered an injury in fact that is fairly traceable to the challenged action and is redressable by a favorable judicial decision. *Steel Company v. Citizens for a Better Environment*, 118 S.Ct. 1003, 1017 (1998). To demonstrate constitutional standing, a plaintiff must prove (1) that he or she suffered an injury in fact; (2) the existence of a causal connection specifically traceable to the unconstitutional conduct of defendants; and (3) the likelihood that a favorable outcome will redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

An association has standing to sue on behalf of its members when the members would otherwise have independent standing to sue, the interests sought to be protected are germane to the organization's purpose, and the claim asserted does not require the participation of individual members in the lawsuit. *Pennell v. City of San Jose,* 485 U.S. 1, 7 n. 3 (1988); *see also Hunt v. Wash. Apple Adver. Comm'n,* 432 U.S. 333, 343 (1977). This is termed "associational" standing.

In this case, plaintiff is an association representing boarding home members. Plaintiff challenges the constitutionality of RCW 18.20.440. When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred or proved in order to establish standing depends considerably upon whether the plaintiff is itself an object of the action (or forgone action) at issue. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992). If the plaintiff is the subject of challenged action, "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring action will redress it." *Id.* at 561-62. Here, the terms of the provider agreements entered into by the boarding homes are substantially impaired. Boarding homes are the subject of the challenged action, RCW 18.20.440. The obligations and burdens imposed by RCW 18.20.440 speak for themselves, and no additional evidence or assertions are necessary to establish standing. *Cf. Heckler v. Mathews,* 465 U.S. 728, 740 n. 9 (1984) (concluding that the plaintiff had standing to challenge a federal statute on constitutional grounds because there was "no doubt about the direct causal relationship between the government's alleged deprivation of appellee's right to equal protection and the personal injury appellee has suffered-denial of ... benefits solely on the basis of [the classification]").

Finally, because boarding homes themselves have standing to pursue a Contract Clause claim; the interests sought to be protected are germane to the WHCA's purpose; and the claim asserted does not require the participation of individual members in the lawsuit, WHCA, acting on behalf of boarding home members, has associational standing to pursue the claim. The court notes that DSHS agrees that WHCA has standing.

## LEGAL STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party. *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed.R.Civ.P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*. Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

## DISCUSSION

1. *Contract Clause.*

Plaintiff contends that RCW 18.20.440 violates Art. I, Section 10, Clause 1 of the United States Constitution (the Contract Clause), which provides as follows:

> No State shall enter into any treaty, alliance, or confederation; grant letters of marque and reprisal; coin money; emit bills of credit; make anything but gold and silver coin a tender in payment of debts; pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts, or grant any title of nobility.

2. *Scope of Review*

Federal law controls whether state statutes create contractual rights protected by the Contract Clause. *See Continental Illinois National Bank and Trust Co. of Chicago v. State of Washington,* 696 F.2d at 698.

WHCA contends that the court should apply a high level of scrutiny to a Contract Clause claim when the State is a party to the contract that the law is intended to affect. The Contract Clause limits the power of the States to modify their own contracts as well as to regulate those between private parties. *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 17 (1977). WHCA argues that states may substantially impair their contractual obligations without violating the Contract Clause when the impairment is reasonable and necessary to serve an important public purpose. *See Id.* at 25. Accordingly, WHCA contends that the court must determine (1) whether that law operates as a substantial impairment to a contractual relationship; and (2) if so, whether the impairment is reasonable and necessary to serve an important public purpose. *Cont'l Ill. Nat'l Bank & Trust Co. Of Chicago v. State of Wash.*, 696 F.2d 692, 697 (9th Cir. 1983); *State of Nev. Employees Assoc., Inc. v. Keating*, 903 F.2d 1223, 1226 (9th Cir. 1990).

DSHS argues that the court should employ a more deferential standard of review to a law that is challenged as a violation of the Contract Clause. "Although the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'" *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 410 (1982)(quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434 (1934)). DSHS contends that the court should apply the following test: (1) whether the state law has operated as a substantial impairment of a contractual relationship; (2) whether the state has a significant and legitimate public purpose for the law; and (3) whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption. *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1147 (9th Cir. 2004); *see Continental Illinois National Bank and Trust Co. of Chicago v. State of Washington*, 696 F.2d 692, 697 (9th Cir. 1983), citing *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234 (1978). This deferential standard, however, appears to apply to laws that impair contracts between private parties, not to contracts to which the state is a party. "Unless the State itself is a contracting party, 'as is customary in reviewing economic and social regulation, ... courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.' " *Energy Reserves Group, Inc. v. Kan. Power & Light Co.*, 459 U.S. at 412-13 (quoting

*United States Trust Co.,* 431 U.S. at 22-23) (footnote omitted). Courts defer to a lesser degree when the State is a party to the contract because "the State's self-interest is at stake." *United States Trust Co. of New York v. New Jersey,* 431 U.S. at 25-26.

DSHS contends that the cases relied upon by WHCA are aimed primarily at reducing a state's financial obligations after the fact, not on laws designed to protect vulnerable adults or low-income persons. However, in determining whether a law is reasonable and necessary to serve an important public interest–the test set forth by WHCA–the court takes into account, and carefully considers, the magnitude of the public interest, which in this case is to protect vulnerable adults and low income persons.

It appears that the appropriate test for determining whether RCW 18.20.440 violates the Contract Clause is whether (1) whether that law operates as a substantial impairment to a contractual relationship; and (2) if so, whether the impairment is reasonable and necessary to serve an important public purpose. Although the law does not speak in terms of balancing the extent of the impairment of contracts against how necessary and reasonable the impairment is, it is apparent to this court that it is the court's role to balance these interests.[1]

   3. *Analysis of Contract Clause Claim*

      A. *Substantial Impairment of Contractual Relationship*

The first prong of the test is whether the State law, RCW 18.20.440, operates as a substantial impairment of a contractual relationship.

Plaintiff contends, and defendants agree, that the provider agreement between DSHS and a boarding home constitutes a contractual relationship between the boarding home, which provides services to individuals who qualify for payment of those services by the State, and the State, which pays for those services with partial funding from federal Medicaid funds.

The next issue is whether RCW 18.20.440 impairs that contractual relationship. The provider agreements permit boarding homes to terminate participation in the Medicaid program and terminate services to residents. RCW 18.20.440 retroactively and unilaterally invalidated the contract's

---

[1] The court notes that, in the bill analyses, DSHS recognized that SB 6807 would require amendment of boarding home provider contracts. Dkt. 15-3, at 17 and 21. There is no showing in the record that the legislature balanced the necessity of the legislation against the contract rights of WHCA's members.

ORDER
Page - 13

termination clause and requires boarding homes withdrawing from the Medicaid program to continue to provide services to residents receiving Medicaid on the date of withdrawal (from Medicaid) and certain private-pay residents who become eligible for Medicaid within 180 days. DSHS agrees that RCW 18.20.440 modifies the termination provision of the existing contracts. (Dkt. 42, at 2). Accordingly, RCW 18.20.440 impairs the contractual relationship between DSHS and the boarding homes by invalidating the termination provisions of the provider agreements..

Finally, the court must determine whether the contract impairment was substantial. A contract impairment must be substantial to violate the Contract Clause. *Univ. of Hawaii Prof. Assembly v. Cayetano,*, 183 F.3d 1096, 1104 (9th Cir. 1999). An impairment of a public contract is substantial if it deprives a private party of an important right, thwarts performance of an essential term, defeats the expectations of the parties, or alters a financial term. *Continental Illinois National Bank and Trust Co. of Chicago v. State of Washington*, 696 F.2d at 693. The provider agreements were entered into by DSHS and boarding homes that wished to participate in the Medicaid program. The provider agreements provided that a boarding home could terminate its Medicaid contract for any reason on thirty days' notice, at which time the State was no longer obligated to reimburse the boarding home for providing services to Medicaid residents. Residents could be transferred to other facilities, subject to the requirements of chapter 70.129 RCW. DSHS agree that this modification was most likely substantial for purposes of Contract Clause analysis. Dkt. 42, at 2. RCW 18.20.440 substantially impaired boardings homes' ability to withdraw from the Medicaid program and transfer residents. Significantly, the provider agreements contained provisions that permitted boarding homes and DSHS to terminate the agreements for convenience. RCW 18.20.440 changed those agreements unilaterally and shifted the mutuality of the obligations. RCW 18.20.440 substantially impaired the provider agreements between boarding homes and DSHS.

B. *Reasonable and Necessary to Serve Important Public Interest* [2]

DSHS maintains, and WHCA concedes, that DSHS has a legitimate interest in regulating the transfer of residents when a boarding home withdraws from the Medicaid program. It is undisputed

---

[2] If this dispute between boarding homes and DSHS were only about payment rates, a different "reasonable and necessary" analysis might apply. The issue before the court involves the extent to which a state may alter provisions of contracts with boarding homes in the interest of protecting vulnerable adults.

that Medicaid residents of boarding homes are vulnerable elderly and/or disabled adults, and that forced and sudden discharge poses a significant threat to the residents' emotional and physical well-being.

WHCA contends (1) that the magnitude of the problem did not justify the drastic remedy in RCW 18.20.440, since, in 2007, only one company terminated two of its twenty boarding home Medicaid contracts; (2) that DSHS has not shown that it was unprepared to responsibly handle the discharges that occurred in the ordinary course; (3) that a prospective change to the law would have been a reasonable policy solution; and (4) that DSHS could have raised its reimbursement rate and avoided Medicaid withdrawals.

WHCA maintains that the concern that there would be a wide-scale withdrawal from the Medicaid program that would traumatize vulnerable adults and strain DSHS's resources could have been remedied by a much more limited amendment, presumably to chapter 70.129 RCW, as follows:

- Extend the 30 day termination and notice provision to 60 or 90 days; this reasonable change to the law would give residents and family more time to adjust to (and participate in) the transfer process, while also affording DSHS staff ample time to use their considerable skill and expertise to facilitate a safe and appropriate transfer for affected residents; and/or

- Temporarily limit a boarding home's right to discharge a resident if discharge would pose a serious health or safety risk; other states have imposed similar limitations. *See, e.g.,* Tenn. Dep't of Health R. 1200-8-6-.05(13)(a) (involuntary discharge from nursing home must take into account the "traumatic effect on the resident") (referenced in *Linton, infra*, at 65 F.3d at 515).

Dkt. 41, at 21.

DSHS contends that the restrictions imposed by RCW 18.20.440 are reasonable because the conditions are limited in scope and duration. DSHS argues that (1) the statute does not prevent boarding homes from withdrawing from Medicaid, but requires that if they do, the discharge of Medicaid residents will occur over time, by death and change in care needs, not suddenly and simultaneously, which can pose risks to vulnerable residents; (2) boarding homes can still transfer or discharge residents whose needs it can no longer meet or reasonably accommodate; (3) Medicaid reimbursement rates since 2007 have held steady or increased; and (4) if a boarding home maintains its Medicaid contract, it may reduce the number of Medicaid residents as residents discharge from the facility, and replace those residents with private pay residents. Dkt. 20, at 22-24.

The record does not show that the drastic measure of requiring boarding homes to continue to provide services to boarding home residents receiving Medicaid on the date of withdrawal (from Medicaid) and certain private-pay residents who become eligible for Medicaid within 180 days, in exchange for the Medicaid rate DSHS decided to pay, was reasonable or necessary.

Such a requirement would even fail the deferential test urged by DSHS. Under that test, the court must inquire "whether the adjustment of 'the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption.' " *Energy Reserves Group, Inc. v. Kan. Power & Light Co.*, 459 U.S. at 412-13 (quoting *United States Trust Co. v. New Jersey,* 431 U.S. at 22).

A law is not necessary if the State could have adopted alternatives that would serve the State's purposes equally well without impairing the State's own contracts. *So. Cal. Gas*, 336 F.3d at 896. ("When a state...impairs its own agreements by imposing additional financial burdens on a private party, obvious more moderate alternatives include raising revenue through higher taxes or preserving funds through budget restrictions."). RCW 70.129 provides the procedures that boarding homes are required to follow if residents are discharged or transferred. If those procedures are not adequate to protect boarding home residents from the physical and emotional trauma associated with discharge or transfer, or to prevent DSHS from being overwhelmed by requests to assist with transfer of boarding home residents, a more carefully tailored solution to the problem could have been fashioned. A longer notice period and/or temporary limits on discharges from a facility could, for example, provide a remedy short of prohibiting boarding homes from withdrawing from Medicaid and transferring residents. Another alternative may be a law that would apply prospectively to boarding home agreements entered into after the effective date of the law.

DSHS maintains that impairment of a state's Medicaid contract with nursing homes was upheld in *Linton by Arnold v. Comm'r of Health & Environment*, 65 F.3d 508 (6th Cir. 1995), *cert. denied*, 517 U.S. 1155 (1996). *Linton* arose out of a class action lawsuit filed against the State of Tennessee that resulted in a judgment against the state for, among other things, violation of the federal Medicaid Act. The court ordered Tennessee to create a plan to remediate the adverse effects of the state's and nursing home providers' past violations of the Medicaid Act. To ensure that providers

could not avoid the remedy by withdrawing from the Medicaid program, the plan originally included a "lock-in' provision that required participating nursing homes to retain current Medicaid patients and comply with the Medicaid requirements. *Linton* is not on point for the following reasons: (1) the contracts at issue were private contracts; the lock-in provision did not impair nursing homes' contracts with the state; (2) all contracts before the court were executed after the remedy plan was adopted, rendering the Contract Clause inapplicable; and (3) for any previous contract that may have been in effect at the time the lock-in provisions were adopted, there was no showing that a party either desired or attempted to terminate the contracts. *Linton*, 65 F.3d at 517-518. Significantly, *Linton* involved a court mandated remedy, not a legislative enactment.

The court is sensitive to the burdens placed upon a state agency with limited funds and staff to meet the needs of vulnerable people. The court does not condone the actions of private entities that might be in a position to use vulnerable individuals as pawns in a game to force the government to pay more money to care for those residents. Nonetheless, the law does not permit the government to push back by requiring contractors to provide services involuntarily, leaving the contractors with no way out.

*4. Conclusion*

RCW 18.20.440 violates the Contract Clause of the U.S. Constitution because the sections of the statute challenged by plaintiff are not necessary and reasonable. The court should grant WHCA's motion for summary judgment and deny DSHS's motion for summary judgment.

Therefore, it is hereby

**ORDERED** that Plaintiff's Motion for Partial Summary Judgment on First Cause of Action (Dkt. 14) is **GRANTED**, and a declaratory judgment is **GRANTED** as follows: RCW 18.20.440(1), (3), and (6)(a) and (b) are unconstitutional insofar as these provisions require boarding homes that had provider agreements in effect on March 28, 2008, and that withdrew from the Medicaid program after March 28, 2008, while those agreements were in effect, to continue to provide services to residents receiving Medicaid on the date of withdrawal (from Medicaid) and to private-pay residents who become eligible for Medicaid within 180 days of withdrawal (from Medicaid) because these provisions violate the U.S. const. art. 1, § 10, the Contract Clause of the United States Constitution.

Defendants' Summary Judgment Motion (Dkt. 20) is **DENIED**. Not later than January 23, 2008, the parties are **ORDERED TO SHOW CAUSE** why judgment should not be entered in favor of WHCA and the case closed. If the parties fail to respond by January 23, 2008, to this order to show cause, or if they otherwise fail to show cause, the court will enter judgment in favor of WHCA.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

DATED this 14th day of January, 2009.

ROBERT J. BRYAN
United States District Judge